**Corliss LAMONT d/b/a Basic Pamphlets, Plaintiff,**

v.

**The POSTMASTER GENERAL OF the UNITED STATES, Defendant.**

United States District Court
S. D. New York.

Argued March 10, 1964.

Decided May 5, 1964.

Leonard B. Boudin, of Rabinowitz & Boudin, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York (Anthony J. D'Auria, Asst. U. S. Atty., on the brief), for defendant.

Before HAYS, Circuit Judge, and LEVET and FEINBERG, District Judges.

HAYS, Circuit Judge.

This action challenges the constitutionality of 39 U.S.C. § 4008 (Supp. IV 1959–62), added by Pub.L. 87–793, § 305 (a), Oct. 11, 1962, 76 Stat. 840, which establishes a screening program for communist political propaganda originating abroad and deposited in the United States mails as unsealed mail matter. As plaintiff has requested an injunction restraining the enforcement of an Act of Congress, this court was convened pursuant to 28 U.S.C. §§ 2282, 2284 (1958).[1] Plaintiff has moved for summary judgment and defendant has cross-moved to dismiss the complaint for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b) (1) and (6). We conclude that the plaintiff's motion should be denied and that the complaint must be dismissed.

Section 4008 requires the Postmaster General to detain all unsealed mail matter originating abroad and found to be "communist political propaganda," unless such material has been furnished pursuant to a subscription, or the addressee (upon being notified of the detention) requests delivery, or the Postmaster General oth-

---

1. In Amlin v. Shaw, No. 63–635–PH, S.D. Cal., Feb. 13, 1964, a complaint challenging section 4008 was dismissed by a single judge, who held that it failed to present either a justiciable controversy or a substantial constitutional question. The complaint in the present case, however, was found by Judge Feinberg, to whom the case was originally assigned, to present a substantial question both on the merits and on the issue of justiciability. Accordingly, he requested the convocation of this court. See Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962). Defendant's renewed motion challenging the convocation of the three-judge court is denied.

erwise ascertains the addressee's desire to receive the detained matter.[2] There are exceptions which include mail addressed to federal agencies, public libraries, educational institutions, and their officials and mail governed by a cultural exchange agreement. To implement Section 4008 the Post Office Department and the Customs Bureau maintain eleven screening points for the interception of communist political propaganda originating abroad. When it is determined that particular mail matter is communist political propaganda a notice (POD Form 2153–X) is sent to the addressee identifying the material being detained and advising the addressee that it will be destroyed within 20 days unless delivery is requested. Part of the form is a reply card on which the addressee may instruct the Post Office whether or not he wants the publication listed and similar publications delivered in the future. A list is kept of those

2. The statute, 39 U.S.C. § 4008, reads as follows:

"§ 4008. Communist political propaganda

"(a) Mail matter, except sealed letters, which originates or which is printed or otherwise prepared in a foreign country and which is determined by the Secretary of the Treasury pursuant to rules and regulations to be promulgated by him to be 'communist political propaganda', shall be detained by the Postmaster General upon its arrival for delivery in the United States, or upon its subsequent deposit in the United States domestic mails, and the addressee shall be notified that such matter has been received and will be delivered only upon the addressee's request, except that such detention shall not be required in the case of any matter which is furnished pursuant to subscription or which is otherwise ascertained by the Postmaster General to be desired by the addressee. If no request for delivery is made by the addressee within a reasonable time, which shall not exceed sixty days, the matter detained shall be disposed of as the Postmaster General directs.

"(b) For the purposes of this section, the term 'communist political propaganda' means political propaganda, as defined in section 1(j) of the Foreign Agents Registration Act of 1938, as amended (22 U.S.C. 611(j)), issued by or on behalf of any country with respect to which there is in effect a suspension or withdrawal of tariff concessions pursuant to section 5 of the Trade Agreements Extension Act of 1951 or section 231 of the Trade Expansion Act of 1962, or any country from which any type of foreign assistance is withheld pursuant to section 620(f) of the Foreign Assistance Act of 1961, as amended.

"(c) The provisions of this section shall not be applicable with respect to

(1) matter addressed to any United States Government agency, or any public library, or to any college, university, graduate school, or scientific or professional institution for advanced studies, or any official thereof, or (2) material whether or not 'communist political propaganda' addressed for delivery in the United States pursuant to a reciprocal cultural international agreement under which the United States Government mails an equal amount of material for delivery in any country described in subsection (b)."

Section 1(j) of the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611(j), whose definition of "Communist political propaganda" is incorporated in Section 4008 provides:

"(j) The term 'political propaganda' includes any oral, visual, graphic, written, pictorial, or other communication or expression by any person (1) which is reasonably adapted to, or which the person disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party or with reference to the foreign policies of the United States or promote in the United States racial, religious, or social dissensions, or (2) which advocates, advises, instigates, or promotes any racial, social, political, or religious disorder, civil riot, or other conflict involving the use of force or violence in any other American republic or the overthrow of any government or political subdivision of any other American republic by any means involving the use of force or violence. * * *"

requesting delivery of such material so that thereafter their mail will not be detained.

The facts are undisputed. Plaintiff, Corliss Lamont, is engaged in publishing and distributing pamphlets and other literature. He frequently receives both solicited and unsolicited mail from all over the world. In July 1963 Lamont was notified by the Post Office Department in San Francisco of the detention of communist political propaganda. Lamont did not reply to the notice. Instead he commenced this action to enjoin the enforcement of the statute. He alleges that Section 4008 infringes his first amendment right to freedom of speech and press and violates the due process clause of the fifth amendment by creating arbitrary and unreasonable classifications.[3]

Shortly after Lamont commenced his action the Acting General Counsel of the Post Office Department wrote to him advising him that the Postmaster General considered the filing of the complaint to constitute an expression of Lamont's desire to receive communist political propaganda mail matter and that, Lamont's wishes having thus been ascertained, his mail would not be detained in the future. Lamont thereupon amended his complaint to request an order directing that his name be removed from any list or record maintained by defendant of persons desiring to receive communist political propaganda. The amended com-

plaint asserted that maintenance of such a list, with the inherent possibility of public disclosure, violated Lamont's first and fifth amendment rights.

■ Keeping in mind "the long-established principle that 'we ought not to pass on questions of constitutionality * * * unless such adjudication is unavoidable,'" Rosenberg v. Fleuti, 374 U. S. 449, 451, 83 S.Ct. 1804, 1806, 10 L.Ed. 2d 1000 (1963), we proceed to an examination of defendant's claim first, that the dispute is moot since the Postmaster General has ordered that Lamont's mail not be detained in the future, and second, that Lamont has made no sufficient showing of a threat of injury by reason of the listing of his name.

### 1. *Mootness*

Lamont's first claim rests on the assertion that his freedom to read, a freedom he finds in the first amendment guaranty of freedom of speech and press, is infringed by the deterrent effect of the requirement that he request delivery of communist political propaganda. But that requirement is no longer applicable to him since defendant has ordered the unimpeded delivery of plaintiff's mail. And, setting aside for the moment his objection to being included in defendant's list, Lamont does not contend that his rights are being violated by the statute as presently applied.

■ When the relief sought, here the unimpeded delivery of mail, is obtained in some other manner prior to final ju-

---

3. Lamont's complaint alleges that the statute is unconstitutional and void upon its face and as applied because:

"a. it violates plaintiff's right to freedom of speech and press as guaranteed by the First Amendment to the United States Constitution;

"b. it violates the due process clause of the Fifth Amendment to the United States Constitution in that it is vague, indefinite and uncertain and fails to provide adequate or any procedural safeguards for making the determination as to what is 'Communist political propaganda', assuming such a determination can ever be made;

"c. it violates the due process clause of the Fifth Amendment to the United

States Constitution by creating an arbitrary and unreasonable classification, to wit: persons desiring to receive Communist political propaganda, and impliedly stigmatizing members of that class and holding them up to opprobrium;

"d. it violates the due process clause of the Fifth Amendment to the United States Constitution by creating an arbitrary and unreasonable classification, to wit: officials of United States Government agencies, public libraries, colleges, universities, graduate schools and scientific or professional institutions for advanced studies, which class is exempt from the provision of the statute, with the result that persons in the position of plaintiff are discriminated against."

dicial disposition, the controversy becomes moot and the court ceases to have jurisdiction. Taylor v. McElroy, 360 U.S. 709, 79 S.Ct. 1428, 3 L.Ed.2d 1528 (1959); Atherton Mills v. Johnston, 259 U.S. 13, 42 S.Ct. 422, 66 L.Ed. 814 (1922). The same principle applies even when challenged governmental action continues to affect the complainant if no objection is raised to the changed manner of its incidence. Natural Milk Producers Ass'n v. San Francisco, 317 U.S. 423, 63 S.Ct. 359, 87 L.Ed. 375 (1943). See generally Diamond, Federal Jurisdiction To Decide Moot Cases, 94 Pa.L.Rev. 125, 133–35 (1946).

Lamont argues that a defendant cannot moot a controversy in which the public interest is involved by the expedient of ceasing to apply a statute once a court challenge has been instituted. He contends that the Government has attempted to render this action moot as part of a policy of avoiding an adjudication of the statute's validity, that the persons whose freedom is most curtailed by the statute are those too timorous to protest, and that there is consequently a public interest in permitting plaintiff to continue his action so as to obtain an adjudication on behalf of these other persons.

■ The cases upon which Lamont relies, e. g., United States v. W. T. Grant Co., 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43, 65 S. Ct. 11, 89 L.Ed. 29 (1944); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 516, 31 S.Ct. 279, 55 L.Ed. 310 (1911), do not support his thesis. The public interest involved in those cases was that of enforcement by the Government of a regulatory statute. The cases hold that voluntary cessation of allegedly illegal conduct will not render the cause moot where the defendant is able at any time to recommence the illegal conduct. If there is no likelihood of a return to the old ways, the controversy will be moot even though the public interest is involved.

"The defendant is free to return to his old ways. This, *together with*

a public interest in having the legality of the practices settled, militates against a mootness conclusion. * * * For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right * * *. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.

*"The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'"*

United States v. W. T. Grant Co., supra, 345 U.S. at 632–633, 73 S.Ct. at 897, 97 L.Ed. 1303 (Footnotes omitted; emphasis added).

■ It is not contended here that the Postmaster General is likely to resume detention of Lamont's mail. Nor could it be. This is not a case where abandonment by a defendant of a prior course of conduct is to be explained by a change in attitude which may prove transient. Here the Postmaster General's actions have at all times been consistent with the mandate of the statute. The statute has been enforced both before and after the initiation of this action. Lamont, by his own move, has changed the manner of enforcement as to him.

Moreover Lamont does not seek here to enforce a regulatory statute. He asks us to hold a statute invalid under the constitution. We know of no instance where the Supreme Court in rejecting a claim of mootness has announced a "public interest" in the adjudication of a constitutional issue. Our tradition of judicial reluctance to decide constitutional questions in advance of strictest necessity, see Ashwander v. T.V.A., 297 U.S. 288, 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)—and particularly the line of decisions holding that a litigant who invokes the power to annul legislation on grounds of its unconstitutionality "must be able to show * * * that he has sustained or is immediately in danger of sustaining some

direct injury as a result of its enforcement," Massachusetts v. Mellon, 262 U. S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); see Poe v. Ullman, 367 U.S. 497, 502–509, 81 S.Ct. 1752, 6 L.Ed. 2d 989 (1961) (opinion of Frankfurter, J.); Communist Party of the United States v. Subversive Activities Control Bd., 367 U.S. 1, 70–81, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); Comment, Threat of Enforcement—Prerequisite of a Justiciable Controversy, 62 Colum.L.Rev. 106 (1962)—dictates the conclusion that in cases such as this the public interest requires an exacting application of the standards governing mootness claims. See Donaldson v. Read Magazine, Inc., 333 U.S. 178, 184, 68 S.Ct. 591, 92 L.Ed. 628 (1948).

■ Lamont's suggestion that he be permitted to represent the interests of nonparties subject to the statute does not affect our analysis of the public interest as it relates to the mootness of Lamont's first claim. Although it not infrequently happens that a party to constitutional litigation is representative of a class (e. g., taxpayers, parents), a determination of mootness will nevertheless be made on the basis of the factual circumstances applicable to the party himself, not to the class. See Doremus v. Board of Educ., 342 U.S. 429, 432, 72 S.Ct. 394, 96 L.Ed. 475 (1952). We postpone until after our discussion of the problem posed by the second part of Lamont's complaint, consideration of his contention that, despite the absence of any controversy between him and the Postmaster General, he should nevertheless be permitted to sue as the representative of others similarly situated.

2. *Timeliness of the Second Claim.*

Lamont requests an order directing that defendant remove his name from lists and records of persons desiring to receive communist political propaganda.

Viewed separately, this part of the complaint does not state an actual controversy, for there is no allegation that Lamont has demanded the requested relief from the defendant or that it has or would be refused. But of course this issue cannot be so simply resolved, since defendant's acquiescence in such a demand would subject Lamont's mail to renewed detention thus reviving that aspect of the controversy. In substance, then, the complaint must be regarded not as asserting two separate claims, but as stating a single claim with alternative allegations of injury. Either plaintiff's mail is detained *or* he is listed as a person desiring to receive communist political propaganda. We held above that the controversy was moot insofar as it rested on an allegation of injury stemming from detention of plaintiff's mail. We now consider Lamont's contention that inclusion in a list of persons desiring to receive communist political propaganda is a sufficient showing of injury to permit him to challenge the statute as a whole.

Lamont maintains that he is injured in two respects: (1) that the mere fact of inclusion in a list circulated to Post Office personnel infringes his right of anonymity, and (2) that the list will be distributed to other government agencies, including Congressional investigating committees, and eventually to the general public. Both effects are said to deter him from the free exercise of his rights of speech and association.

The statute makes no provision whatsoever for keeping any list or record of persons desiring to receive communist political propaganda. Lamont assumes, presumably correctly, that such a list is kept since the agents of the Postmaster General would not otherwise be able to ascertain what persons are to get the mail in the regular course. But if any injury results from the keeping of such a list it is an injury which is purely incidental to the statutory scheme and one which appears to be wholly unintended.

It is not sufficient for a litigant merely to assert that particular government action or the threat of such action deters him from the exercise of some constitutional right. The claimed deterrent effect must be grounded in a realistic appraisal of the impact of the action being challenged. Poe v. Ullman, 367 U.S. 497,

508, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (opinion of Frankfurter, J.). And when the claim of injury is based upon the prospect of future action, the threat of such action must be imminent and not hypothetical or imagined. Poe v. Ullman, supra; Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 71–81, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

Thus, in Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), cited by Lamont, the complainants alleged both that they had been falsely classified as communist organizations and that such classification had resulted in substantial economic injury. 341 U.S. at 137, 158–159, 71 S.Ct. 624, 95 L.Ed. 817. Though these allegations, which were deemed admitted by the Attorney General, were held to establish the existence of a justiciable controversy, the Court treated the question of justiciability as a problem of substantial difficulty.

By contrast Lamont does not indicate that the present circulation of the list to government personnel or any future distribution that may occur will result in any material injury, such as loss of customers or social ostracism. Lamont does contend, in a conclusionary fashion, that future public disclosure of the list would lead to public opprobrium. It is not immediately apparent why this should be so. Classification as a person desiring to receive communist political propaganda—as distinguished from, for example, classification as a "communist front organization"—need not connote disapprobation. Indeed, the statutory exception for public libraries and for educational institutions and their officials,[4] evidences Congressional recognition that reputable organizations and individuals may receive communist political propaganda without any disgrace attaching.

In any event, the threat of general distribution of the list is largely speculative. Lamont cites statements in Congressional hearings indicating that under the previous foreign propaganda screening program it was the practice of the Post Office to disclose to Congressional committees the names of recipients of communist propaganda. See Hearings before the House Committee on Un-American Activities, 85th Cong., 2d Sess., Sept. 3, 4 and 5, 1958, at p. 2794; cf. Hearings before the Subcommittee to Investigate the Administration of the Internal Security Act, etc., of the Senate Committee of the Judiciary, 87th Cong., 1st Sess., Mar. 26, 1959 and April 3, 1961, at p. 56 (bulk shipments to distributors). But that program, which was initiated without specific statutory authorization and was discontinued by Executive Order on March 17, 1961, nineteen months before enactment of the present statute, differed in several important respects from the present program. See generally, Schwartz and Paul, Foreign Communist Propaganda in the Mails: A report on Some Problems of Federal Censorship, 107 U.Pa.L.Rev. 621, 633–49 (1959). In view of the change in administration and the material differences between the two programs, which may well be taken to manifest a basic change in administrative philosophy, we would not be disposed to lightly assume that administrative policy regarding disclosure of lists of recipients of communist propaganda has remained constant.

In support of the conclusion that administrative policy has indeed changed the Government submits an affidavit by Tyler Abell, Associate General Counsel to the Post Office Department, which states that the list kept of addressees to whom communist propaganda will be sent without detention will not be made public and that instructions have been issued prohibiting any part of the list from being released to any person, United States Government agency or other group without the express permission of the Post Office Department. As Lamont points out, this affidavit does not establish conclusively that disclosure will not occur, since it does not specify under

what circumstances permission might be given for the list's release. But it does evidence a solicitous regard for the confidentiality of this information, and we think that on the whole this affidavit suffices to deprive the prior administrative practice cited by Lamont of whatever probative value it may have had. In this posture of the case, we can only conclude that public disclosure is only an abstract possibility, not an immediate threat.

■■ We hold that present circulation of the list to Post Office personnel does not constitute such a legal injury as will permit plaintiff to maintain this suit, and that the threat of future public distribution of the list is not sufficiently imminent to present a controversy ripe for adjudication.

### 3. *Standing to assert the rights of third parties.*

Lamont contends that even if this court should find that there is no justiciable controversy between him and the Postmaster General, he should nevertheless be permitted to continue this action "in order to vindicate the rights of the many persons who are not willing or able to sue but who, like the plaintiff, have been and will be injured by this enforcement of the statute." Lamont asserts that the Government's policy for administering this statute is deliberately designed to insulate it from judicial scrutiny, and that the rights of numerous individuals who are unwilling to bring suit or request delivery of detained mail matter are being abridged and will continue to be abridged if this action is dismissed. That assertion is neither admitted nor denied by the Government in this case.[5]

■ As a general rule litigants may not invoke the rights of parties not before the court.

"Nor can respondents vindicate any general interest which the public may have in the construction of the Act by the Secretary and which must be left to the political process. Respondents, to have standing in court, must show an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law."

Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940); accord, Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) (fourteenth amendment claim). Although numerous exceptions have been made to the doctrine that a litigant may not assert the rights of third parties, see, e. g., NAACP v. Alabama, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (right of anonymity may be asserted by association on behalf of its members); Pierce v. Society of Sisters, 268 U.S. 510, 534–536, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468 (1925) (private school may assert rights of the parents of its pupils), in no case has such an exception been created when, as here, the litigant failed to demonstrate that he is, in his own right, an injured party. See Sedler, Standing To Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L. J. 599, at 630 n. 129, 646 (1962). And in general there has been some pre-existing relationship between the complainant and the person whose rights he seeks to assert other than the fact that both are affected by the challenged statute. See Sedler, supra at 641–645, 647.

---

5. It should be noted, however, that a suit challenging section 4008 might be brought by a sender of detained material, e. g. a distributor of Russian books or magazines. Cf. amended complaint in McReynolds v. Christenberry, Civil No. 63–364S, S.D.N.Y., filed March 30, 1964. It would not appear that such a suit could be mooted by any administrative action, and it would equally serve to secure full protection of the rights of recipients. Indeed, past challenges to statutes regulating the use of the mails, have, almost without exception, been advanced by senders, whose interest is usually more direct than that of a recipient—at least when, as here, the mail matter involved is unsealed, unsolicited, mail. See, e. g., Hannegan v. Esquire, Inc., 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946); United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704 (1921).

██ The present case does not fit within any of the established exceptions, and we hold that Lamont has no standing to invoke the rights of persons not parties to this action.

Defendant's motion to dismiss the complaint is granted, and plaintiff's motion for summary judgment is denied.

Settle order on notice.

FEINBERG, District Judge (dissenting).

As the majority opinion correctly points out, while Section 4008 does not specifically authorize the Post Office to maintain a list of persons desiring to receive communist political propaganda, such a list is essential to effective implementation of the statutory scheme. Plaintiff, therefore, is in a position to challenge the constitutionality of the statute, even though his mail will not be detained in the future, if he has suffered, or is imminently threatened with, a legal injury as a result of the presence of his name on the list. The majority concludes as a matter of law that public disclosure of the list "is only an abstract possibility, not an immediate threat." It refers to the prior Post Office practice of disclosing the names on such a list to Congressional committees, but relies upon an affidavit of the Associate General Counsel of the Post Office as depriving that prior practice cited by plaintiff "of whatever probative value it may have had." This conflict on a crucial point raises a genuine issue as to a material fact—likelihood of public disclosure of the list—requiring denial of the government's motion, whether it be treated as a motion to dismiss or as one for summary judgment. Cf. Rule 12(b), Fed.R.Civ.P.

The majority also finds that " * * * Lamont does not indicate that the present circulation of the list to government personnel or any future distribution that may occur will result in any material injury, such as loss of customers or social ostracism," and concludes that "classi-

fication as a person desiring to receive communist political propaganda * * * need not connote disapprobation." It may be doubted whether one asserting the justiciability of a constitutional right to anonymity need show more in the way of injury than a threat of public disclosure, cf. Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); United States v. Rumely, 345 U.S. 41, 57, 73 S.Ct. 543, 97 L.Ed. 770 (1953) (concurring opinion), or, perhaps, more than the limited disclosure to Post Office personnel concededly present here.[1] But, in any event, whether classification as a person desiring to receive communist political propaganda *need* connote public disapprobation is irrelevant, since it ordinarily does so connote, and social ostracism flows from this. Cf. Grant v. Reader's Digest Ass'n, 151 F.2d 733, 735 (2 Cir.), cert. denied, 326 U.S. 797, 66 S.Ct. 492, 90 L.Ed. 485 (1946).

Therefore, I dissent from the grant of the government's motion. In addition, were I to follow the lead of the majority in making a finding as to this issue on this record, I would be inclined to conclude that there is a sufficient threat of injury to satisfy the requirement of "ripeness." This conclusion would be predicated largely on the irreparable nature of the threatened injury and the improbability of plaintiff having sufficient notice of public disclosure of the list to allow him to raise his constitutional objections before the injury is inflicted.

In addition, the majority opinion concedes that there are numerous exceptions to the doctrine that a litigant may not assert the constitutional rights of third parties. It concludes that this case is not appropriate for invoking one of the exceptions because plaintiff has failed to demonstrate that he is, in his own right, an injured party. However, if the conclusion as to ripeness with regard to the list is incorrect (as I think it is), then the rights of third parties who themselves might be afraid to bring suit are

---

1. Cf. *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 139-141, 71 S.Ct. 624, 95 L.Ed. 817 (1941) (charac- terizing the listing challenged there as defamatory); Restatement, Torts § 577 (publication rule in defamation cases).

significant. Thus, one of the arguments advanced against Section 4008 is that the standard of "communist political propaganda" is so vague that it could include relatively inoffensive publications.[2] Yet, one who would make this argument in testing the constitutionality of Section 4008 must either announce an interest in communist political propaganda and invite social disapprobation or forego the mail affected by the Section. Allowing plaintiff in this suit to raise the rights of third parties would extricate them from this dilemma. Note, 77 Harv.L. Rev. 1165, 1170 (1964).

There is another factor here which may not of itself furnish sufficient basis for denying the government's action but which warrants comment. This is one of several actions brought to test the constitutionality of Section 4008 by a recipient whose mail has been withheld. In each case, after the complaint had been served, the Postmaster General delivered such mail to the plaintiff and then asked the court to dismiss the action as moot.[3] With commendable candor, the government admits that this device, if approved by the courts, will prevent any potential recipient of such mail from testing the statute.[4] I doubt whether the doctrine of mootness or justiciability requires this result, cf. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331–336, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961) (dissenting opinion), particularly where a First Amendment right is allegedly involved.

This dissent is not to be taken as expressing any opinion as to the constitutionality of Section 4008, since the majority opinion does not reach these issues, and it would, therefore, be inappropriate for me to do so.

2. Cf. Douglas, The Right of Association, 63 Colum.L.Rev. 1361, 1372 (1963).

3. In addition to the instant case, complaints were filed in the Northern District of California (Heilberg v. Fixia, No. 41660, N.D.Cal.) and the Southern District of California (Amlin v. Shaw, No. 63–635–PH, S.D.Cal.). It appears that the government's position in both

cases was as stated in the text. See Transcript of hearing in the Heilberg case, dated October 24, 1963, p. 5; Judgment of Dismissal in the Amlin case, dated February 13, 1964, on the ground, *inter alia*, that there is no justiciable case or controversy.

4. Transcript of oral argument, pp. 61–62.